AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Oct 09, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No.   2:20-mj-0155 DB |
| | ) |
| JAYSON FERNANDEZ BUTAY | ) |
| | ) |
| | ) |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ October 8, 2020 _____ in the county of _____ Sacramento _____ in the

_____ Eastern _____ District of _____ California _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2252(a)(4)(B) | Possession of Child Pornography |

This criminal complaint is based on these facts:

☒ Continued on the attached sheet.

/s/Orcina A. Pacheco-Garcia (signed electronically)

*Complainant's signature*

Orcina A. Pacheco-Garcia, Special Agent, FBI

*Printed name and title*

Sworn to me and signed telephonically.

Date:   10/9/2020

City and state:   Sacramento, California

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

McGREGOR W. SCOTT
United States Attorney
TANYA B. SYED
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. |
| Plaintiff, | AFFIDAVIT |
| v. | |
| JAYSON FERNANDEZ BUTAY, | |
| Defendant. | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

**I.      INTRODUCTION**

I, Orcina A. Pacheco-Garcia, a Special Agent (SA) with Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation and have been since March 2019.  I have worked for the Federal Bureau of Investigation in other capacities since September 2017.  I am currently assigned to the Sacramento Division.  While employed by the FBI, I have investigated federal criminal violations related to, among other things, the exploitation of children and human trafficking.  I have gained experience through training at the FBI Academy as well as by conducting these types of investigations.  As part of my daily duties,

I investigate criminal violations relating to child exploitation and child pornography, including, but not limited to, violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252, and 2252A.  In the course of my employment, I have observed and reviewed numerous examples of child pornography in all forms of media, including computer media.  Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251, 2252, and 2252A.

2.      This affidavit is made in support of a criminal complaint and arrest warrant against Jayson Fernandez BUTAY for Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).

3.      The statements contained in this Affidavit are based in part on: information provided by other law enforcement agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; investigation I have participated in; and my experience, training and background as an Agent with the FBI.  Because this Affidavit is being submitted for the limited purpose of securing an arrest warrant for BUTAY, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation and probable cause for the requested arrest warrant for a violation of 18 U.S.C. § 2252(a)(4)(B).

## II.      RELEVANT STATUTES

4.      This investigation concerns alleged violations of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2), Possession of Child Pornography, which provides that:

Any person who… knowingly possesses, or knowingly accesses with intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if (i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and (ii) such visual depiction is of such conduct; shall … fined under this title or imprisoned not more

than 10 years, or both, but if any visual depiction involved in the offense involved a prepubescent minor or a minor who had not attained 12 years of age, such person shall be fined under this title and imprisoned for not more than 20 years.

### III.     PROBABLE CAUSE

5.      On October 7, 2020, I telephonically swore out two search warrants, one for ADDRESS 1 and one for snapchat accounts XCALEB619 and RYANR820.  The affidavit for such warrants is attached hereto as Exhibit 1 with the location of the physical address redacted, and is incorporated herein to the probable cause section.  Such affidavit is true and correct to the best of my knowledge and belief.

6.      On October 8, 2020, a federal search warrant was executed at BUTAYS's residence at ADDRESS 1, within the Eastern District of California.  Upon entry of the home, several adults and two minors were found residing inside the residential home.  This search warrant sought contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2251(a) (Production of Child Pornography), 18 U.S.C. § 2252(a)(4)(b) (Possession of Child Pornography), and 18 U.S.C. § 2252(a)(2) (Receipt and/or Distribution of Child Pornography), among other violations.  In conjunction with the service of this search warrant, BUTAY was contacted and, after being read his Miranda rights and stating he understood them, provided a statement to myself and Special Agent Scott Schofield.  He did eventually assert his right to a lawyer.  However, prior to asserting this right to a lawyer, he provided several statements, including, in part, the below summarized statements, which are related to the best of my memory and are not repeated verbatim:

> a.   BUTAY lived at the residence at ADDRESS 1 and had for most of his life after immigrating from the Philippines.

> b.   BUTAY owned Lenovo laptop, ASUS laptop, desktop computer, and a Samsung phone that ran the Android operating system.  No one but BUTAY used these devices.  BUTAY provided the password to unlock his laptop computer.

7.       An agent on site conducted a preview of files names and images on the which BUTAY indicated that he owned and used solely and found that there were names, images, and

videos indicative of child pornography.  A further review of the ASUS laptop was conducted at the FBI Field Office in Sacramento where the following files were viewed.  Neither reviews required the use of the password that BUTAY had provided.  This ASUS laptop was found pursuant to the search warrant next to BUTAY's bed, with the laptop cover opened.

- **Filename:** 4yo-rape-cry.webm

  **Path:** Downloads\New folder\0913\New folder\File_254f\4yo-rape-cry.WEBM

  **Duration:** 0:23

  **Description:** Color video depicting a pre-pubescent girl appearing to be approximately 4 years of age lying on her stomach on a bed. An adult male can be seen kneeling behind her subjecting her to vaginal or anal sex.  The girl can be heard crying and saying "I don't want to" over and over.  Near the middle of the video, she attempts to move and another adult hand (not belonging to the man behind her) holds her head in place.

- **Filename:** Kinderotica-Part3.mp4

  **Path:** Downloads\New folder\New Folder\New Folder (2)\KAM3\Kinderotica-Part3.mp4

  **Duration:** 2:06:27

  **Description:** Color video over two ours in length purporting to be "Part 3." The title screen shows a still image of a man spreading a pre-pubescent naked minor girl's vagina open for the camera.   Next is a title screen reading "Chapter 11 – Motherly Love" and a quote reading "A child's first teacher is its mother. – Peng Liyuan".  This quote is over an image of an adult nude woman kissing a pre-pubescent boy's lips while holding his penis.  The video continues to depict child pornography involving adult women and pre-pubescent girls and boys, as well as other child pornography and child erotica.

- **Filename:** Elizaveta 1.mp4

  **Path:** Downloads\New folder\0906\Ev1\Elizaveta 1.mp4

  **Duration:** 18:25

  **Description:** Color video depicting a pre-pubescent naked girl in a bathroom. The girl props herself on a clothes hamper, spreads her legs, and masturbates for the camera.  She later places a plastic bottle on the ground, squats over it and attempts to insert the top of the bottle into her vagina.  The camera at this point shows an extreme close-up of the girl's vagina and the bottle.  The video ends with the camera zoomed on her vagina while she pours water over it.

8.      At the conclusion of this search warrant, BUTAY was taken into custody based on probable cause and booked at the Sacramento County Jail on a federal hold.

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

AFFIDAVIT

## IV.   <u>CONCLUSION</u>

9.   Based on the foregoing, there is probable cause to believe that JAYSON FERNANDEZ BUTAY has committed the crime of Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).

10.   I request that the Court issue an arrest warrant for BUTAY.

I declare under the penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

   /s/Orcina Pacheco-Garcia (signed electronically)
Special Agent Orcina Pacheco-Garcia
Federal Bureau of Investigation

Subscribed and sworn to before me on:  __10/9/2020____ by telephone pursuant to Fed. R. Crim. P. 41(d)(3).

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

APPROVED AS TO FORM BY:

/s/ TANYA B. SYED

TANYA B. SYED
ASSISTANT UNITED STATES ATTORNEY

# Exhibit 1

McGREGOR W. SCOTT
United States Attorney
TANYA B. SYED
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700


Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and INFORMATION ASSOCIATED WITH SNAP, INC. ("SNAPCHAT") ACCOUNTS XCALEB619 AND RYANR820 THAT ARE STORED AT PREMISES CONTROLLED BY SNAP, INC. | CASE NO. AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT |

I, Orcina A. Pacheco-Garcia, a Special Agent (SA) with Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

## I.   INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation and have been since March 2019. I have worked for the Federal Bureau of Investigation in other capacities since September 2017. I am currently assigned to the Sacramento Division. While employed by the FBI, I have investigated federal criminal violations related to, among other things, the exploitation of children and human trafficking. I have gained experience through training at the FBI Academy as well as by conducting these types of investigations. As part of my daily duties, I investigate criminal violations relating to child exploitation and child pornography, including, but not limited to, violations pertaining to the

1

1   illegal production, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C.

2   §§ 2251, 2252, and 2252A.  In the course of my employment, I have observed and reviewed numerous

3   examples of child pornography in all forms of media, including computer media.  Moreover, I am a

4   federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§

5   2251, 2252, and 2252A, and I am authorized by the Attorney General to request a search warrant.

6          2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of

7   Criminal Procedure for a warrant to search the premises known as ███████████████████

8   ████████████████ (hereinafter, "SUBJECT RESIDENCE"), which is more specifically described

9   in Attachment A-1, and the person of **Jayson Fernandez Butay,** for contraband and evidence, fruits,

10  and instrumentalities of violations of 18 U.S.C. § 2251(a) (Production of Child Pornography), 18 U.S.C.

11  § 2252(a)(4)(b) (Possession of Child Pornography) and 18 U.S.C. § 2252(a)(2) (Receipt and/or

12  Distribution of Child Pornography), which items are more specifically described in Attachment B-1.

13         3.      I also make this affidavit in support of an application for a search warrant for information

14  associated with two certain Snapchat accounts (**ryanr820 and xcaleb619**) (hereinafter, "SUBJECT

15  ACCOUNTS") that are stored at premises controlled by Snap, Inc., which manages records on behalf of

16  Snapchat and is an electronic communications and/or remote computing service provider headquartered

17  at ████████████████████ Santa Monica, California.  The information to be searched is

18  described in the following paragraphs and in Attachment A-2. This affidavit is made in support of an

19  application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require

20  Snap, Inc. to disclose to the government copies of the information (including the content of

21  communications) further described in Section I of Attachment B-2. Upon receipt of the information

22  described in Section I of Attachment B-2, government-authorized persons will review that information

23  to locate the items described in Section II of Attachment B-2.

24         4.      The statements in this affidavit are based in part on information received from the FBI

25  Copenhagen Legat Attaché and Finland Police Department, as well as on my own investigation of this

26  matter.  Since this affidavit is being submitted for the limited purpose of showing probable cause to

27  secure a search warrant, I have not included each and every fact known to me concerning this

28                                                         2

investigation.   I have set forth only the facts that I believe are necessary to establish probable cause to

believe that contraband and evidence, fruits, and instrumentalities of the above listed violation(s) are

located at the SUBJECT PREMISES and/or in the SUBJECT ACCOUNTS.  Unless specifically

indicated, all conversations and statements described in this Affidavit are related in substance and in

part.

## II.   PROBABLE CAUSE

5.   The Finland Police Department identified a victim of a child pornography extortion

scheme, and provided the following information to the FBI through correspondence, investigative

documents, and a video with the victim.[1]

6.   Victim 1 told the Finland Police Department that, on or about April 22-23, 2019, Victim

1, 15 years old, had contact with a person unknown to Victim 1 through the Snapchat application.  This

individual (hereinafter referred to as the "Subject") initially used the username Ryan R (Snapchat user

name ryanr820).  Snapchat user ryanr820, sent Victim 1 a friend request on or about April 22, 2019.

During the chat, Victim 1 disclosed her name, age, and country of residence, as well as a facial photo.

Snapchat user ryanr820, in return, sent her a facial photo, which Finland police later determined was

taken from another person's Instagram profile.

7.   Victim 1 further told the Finland Police Department that, during the chat, the subject

asked Victim 1 if she wanted to have some fun and then suggested Victim 1 send him pictures of her

with no clothes on. Victim 1 initially sent the subject pictures with her underwear on.  He then started to

demand nude pictures and threatened to spread the underwear pictures to Victim 1's family and friends if

she didn't send him naked pictures.  On his demand, Victim 1 sent him two pictures of her naked upper

body.  Victim 1 said she had sent him about five pictures.  In three of the images, she was wearing

underwear, and, in two, she had her upper body naked.

---

[1] The undersigned agent has received a copy of a video recording of the Finland Police Department's
interview with the victim, which was conducted in Finnish.  The FBI's translation services have
provided a summary of the interview, but continues to work to provide a detailed transcript.  As such,
the majority of the details provided here are from investigative documents or details from
correspondence provided by the Finland Police Department.

8.       After she sent the pictures, the subject then demanded that Victim 1 send videos of herself.  The subject instructed her on the types of videos he wanted, including what he wanted her to say and do in them.  In the videos, she masturbated naked and called herself the man's slave and bitch. Victim 1 sent him approximately 10 videos.  The subject then sent Victim 1 a picture of him masturbating which only depicted a male penis and no facial.

9.       After sending those videos, the subject exited the chat. Victim 1 felt distress and shame because of what had occurred.  She then deleted the pictures and videos and blocked the ryanr820 username on Snapchat.

10.      On April 23, 2019, username Caleb R (Snapchat user name xcaleb19) had contacted Victim 1 on Snapchat.  Snapchat user name xcaleb19 initially represented that he had met Victim 1 on Omegle.  When Victim 1 asked for a picture to refresh her recollection, Snapchat user name xcaleb19 stated he was the same guy to whom Victim 1 had sent naked videos the previous night.  He threatened to share the pictures and videos Victim 1 had previously sent online.  He requested that she send more pictures and videos.  Victim 1 refused to send him videos and pictures and stated she would report the incident to the police.  Victim 1 asked him to delete the pictures and he replied "maybe".  Victim 1 then stopped the chat and informed her parents about the incident.  At her parents' request, Victim 1 took screenshots of the last chat. These screenshots are attached as Exhibit 1.  The incident was reported to the Finland Police Department on the morning of April 23, 2019.

11.      On July 28, 2020, the FBI Sacramento Field Office received a lead from the Federal Bureau of Investigation Legat Attaché in Copenhagen.  The lead was concerning a Southeastern Finland Police Department investigation, involving the sextortion of a 15-year-old minor.  On November 12, 2019, Finland Police requested Mutual Legal Assistance Treaty from the U.S. Department of Justice.  In the request, authorities in Finland asked U.S. authorities to provide records from Snap, Inc. ("Snapchat") relating to the following accounts: xcaleb619 and ryanr820 (the SUBJECT ACCOUNTS).

12.      On July 1, 2020, Finland Police received the MLAT requested subscriber records from Snapchat.  Upon review of the records, IP address information indicated the suspect was located in U.S. Territory.  Finland Police Department provided case documents and interviews concerning their case

4

1   and requested for FBI to conduct further investigation.

2          13.    Snapchat provided the following subscriber records for user ryanr820: email address:

3   ryanr517517@gmail.com, status: active, display name "Ryan R", creation date November 29, 2018.

4          14.    Snapchat provided the following subscriber information for user xcaleb619, email

5   address ronshoe620@gmail.com, display name "Caleb R", creation date April 22, 2019.

6          15.    On July 13, 2020, Google LLC provided the following information for email address

7   ryanr517517@gmail.com.

8          •      Recovery e-Mail: jaybu517@gmail.com;

9          •      Recovery SMS: 1 [REDACTED]-4114; and

10         •      Various IP activity and addresses, including 2601:204:e380:d5d0:153b:c34:b94e:d6cb

11  used on 06-28-2020 at 07:49:10 UTC and 2601:204:e380:d5d0:153b:c34:b94e:d6cb used on 06-28-2020

12  at 07:39:25 UTC.

13         16.    In addition, Google provided the following subscriber information for

14  ronshoe620@gmail.com:

15         •      Terms of Service IP address: 50.204.109.120; and

16         •      Creation Date: 05-27-2018.

17         17.    After reviewing Finland Police case documents and the subscriber information provided

18  by Snapchat and Google, the FBI Sacramento Field Office conducted investigative work, including to

19  issue Administrative Subpoenas.

20         18.    On September 29, 2020, Comcast responded to the issued Administrative Subpoena and

21  provided the following subscriber information for certain IP addresses associated with

22  ryanr517517@gmail.com (2601:204:e380:d5d0:153b:c34:b94e:d6cb used on 06-28-2020 at 07:49:10

23  UTC and 2601:204:e380:d5d0:153b:c34:b94e:d6cb used on 06-28-2020 at 07:39:25 UTC).

24         •      Subscriber Name: [REDACTED] Butay;

25         •      Service Address: [REDACTED] (the SUBJECT

26  PREMISES to be searched pursuant to this search warrant); and

27         •      Telephone Number: 1 (916) 308-4114 (which is the same phone number associated with

28                                              5

the ryanr517517@gmail.com account, as referenced in paragraph 10 above).

19.     An Administrative Subpoena was served to Sprint Corporation for telephone number 916-308-4114 for the following time period: 01-01-2019 to 08-31-2019. The following subscriber information was provided by Sprint:

- Subscriber name, Jerelyn Butay; and
- Address ████████████████████████ (the SUBJECT PREMISES to be search pursuant to this search warrant).

20.     On October 6, 2020, a search of a law enforcement database for the email address jaybu517@gmail.com came back to Jayson Butay with an address ████████████ ████████ (the SUBJECT PREMISES).

21.     On October 2, 2020, law enforcement observed a Nissan Frontier, license plate ████, which, according to DMV records is registered to Jayson Butay, located outside of ████████ ████████ (the SUBJECT PREMISES).

22.     On September 29, 2020, Comcast provided the following subscriber information for IP address 50.204.109.120 (which was associated with the ronshoe620@gmail.com referenced in paragraph 11 above):

23.     Subscriber name Geweke VI, L.P., service address ████████████████ ████. Geweke VI, L.P. is also known as Geweke Hospitality which operates a hospitality business for various hotels in the Sacramento, CA area. According to Geweke Hospitality website "https://www.gewekehospitality.com/our-properties", one of their properties includes a Hilton Property located at ████████████████ .

24.     California Employment Development Department records requested on September 22, 2020 for Jayson Butay state that he worked for Geweke Hospitality for the period of January 2019 to January 2020 (which includes the time period in which snapchat user Caleb R engaged in his scheme described above with Victim 1) and U.S. Army Reserve for April 2019.

25.     On October 2, 2020, a search of Snapchat accounts **xcaleb619** and **ryanr820** (the SUBJECT ACCOUNTS) revealed both accounts were active.

26. Based on the foregoing facts, there is probable cause to believe that the child pornography extortion scheme targeting Victim 1 was conducted from the SUBJECT PREMISES.

27. Based on the foregoing facts, there is also probable cause to believe that the SUBJECT ACCOUNTS, **xcaleb619** and **ryanr820**, were used as part of the child pornography extortion scheme targeting Victim 1.

### III.   DEFINITIONS

28. The following definitions apply to this Affidavit and Attachment B-1 and B-2:

a. "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b. "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

c. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

7

e.       "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

f.       "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

g.       "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

h.       "Computer software," as used herein, is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i.       A provider of "Electronic Communication Service" ("ESP"), as defined in 18 U.S.C. § 2510(15), is any service that provides to users thereof the ability to send or receive wire or electronic communications.  For example, "telephone companies and electronic mail companies" generally act as providers of electronic communication services.  See S. Rep. No. 99-541 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568.

j.       "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer files from one host to another over a computer network, such as the Internet.  FTP is built on client-server architecture and uses separate control and data connections between the client and the server.

k.       "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer to access the Internet.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

l.       "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

m.       "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

n.       "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

o.       "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

9

p.  "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

q.  "Short Message Service" ("SMS"), as used herein, is a service used to send text messages to mobile phones. SMS is also often referred to as texting, sending text messages or text messaging. The service allows for short text messages to be sent from one cell phone to another cell phone or from the Web to another cell phone.

r.  "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

s.  "Webcam," as used herein, refers to a front-facing video camera that attaches to a computer or that is built into a laptop or desktop screen. It is widely used for video calling as well as to continuously monitor an activity and send it to a Web server for public or private viewing. Webcams generally have a microphone built into the unit or use the computer's microphone for audio.

## IV.   CHARACTERISTICS COMMON TO INDIVIDUALS WHO SOLICIT, RECEIVE, AND/OR PRODUCE CHILD PORNOGRAPHY

29.  Based on my previous investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who solicit, receive and/or produce images of child pornography:

a.  Individuals who solicit, receive, and/or produce child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from

10

literature describing such activity.

b.  Individuals who solicit, receive, and/or produce child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.  Individuals who solicit, receive, and/or produce child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.  Likewise, individuals who solicit, receive, and/or produce child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e.  Individuals who solicit, receive, and/or produce child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of

11

names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.   Individuals who solicit, receive, and/or produce child pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

g.   Based on the above, I believe that the subject, or another user of the SUBJECT ACCOUNTS linked to the SUBJECT PREMISES, likely displays characteristics common to individuals who solicit, receive and/or produce child pornography.

## V.   BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, THE INTERNET, AND EMAIL

30.   I have had both training and the experience and training of other law enforcement officers with whom I have had discussions in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following

a.   Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

b.   Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras and smartphones with cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera or smartphone to the computer. In the last ten years, the resolution of pictures taken by digital cameras and smartphones has increased dramatically, meaning that such have become sharper and crisper. Photos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards often store 32 gigabytes of data or more, which provides enough space to store thousands of high-resolution photographs and/or hours of video

12

footage.  Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera.  The video files can be easily transferred from the camcorder to a computer.

c.      A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Electronic contact can be made to literally millions of computers around the world.  The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography.  Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem.  Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

d.      The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store thousands of images at very high resolution.  In addition, there are numerous options available for the storage of computer or digital files.  One-Terabyte external and internal hard drives are not uncommon.  Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer.  It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them).  Media storage devices can easily be concealed and carried on an individual's person.

e.      The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

13

f.      Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

g.      As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## VI.      COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

31.      As described above and in Attachment B-1, this application seeks permission to search for records that might be found at the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

32.      *Probable cause*. I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been

14

downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

33.   *Forensic evidence.* As further described in Attachment B-1 and B-2, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

15

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected

16

with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge

17

about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

34. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

35. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and

18

software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

   c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

36.   *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

37.   Several people share the SUBJECT PREMISES as a residence. It is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## VII.   <u>SNAPCHAT</u>

38.   Snapchat is a social networking service owned by Snap, Inc. and headquartered at ███ ████████████████████, Santa Monica, CA.

39.   Snapchat is an application for sending and receiving 'self-deleting' messages, pictures, and videos.

40.   A "snap" is a picture or video message taken and shared with other Snapchat users in real-time. Once a snap has been viewed, it is deleted from the company's system and is no longer visible to the recipient. Snapchat users can send text messages to others using the Chat feature. Once a

user leaves the Chat screen, messages viewed by both the sender and the receiver will no longer be visible. The application notifies other users when they are online so they can begin messaging each other. In addition, Snapchat users can send pictures to other users by utilizing the camera on their device. Pictures can also be sent from the saved pictures in the photo gallery of the device.

41.     Accessing a Snapchat account and "snaps" constitute "electronic communications" within the meaning of 18 U.S.C. § 3123. See 18 U.S.C. §§ 3127(1) and 2510(12).

42.     "Our Stories" is a collection of user-submitted "Snaps" from different locations and events. A Snapchat user, with the location services of their device turned on, can contribute to a collection of snaps regarding the event. For example, multiple different Snapchat users at a rave could all contribute to the same "Our Stories" collection by sharing their snaps, even if they do not know each other. Users can also view "Our Stories" events if they are not actually present at the event by subscribing to the story. In addition to "Our Stories," a Snapchat user can keep a sort of photo/video diary using the "Story" feature. Each snap in a "Story" documents the user's experience. Based on the user's privacy settings, the photos and videos added to a "Story" can be viewed either by everyone on Snapchat or just the user's friend. Stories are visible to other users for up to 24 hours.

43.     While a Snapchat message may disappear, the record of who sent it and when still exists. Snapchat records and retains information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a snap. Additionally, Snapchat stores the number of messages exchanged, which users they communicate with the most, message status including if and when the message was opened, and whether the receiver used the native screen capture function of their device to take a picture of the snap before it disappeared.

44.     Snapchat asks users to provide basic contact and personal identifying information to include date of birth. When a user creates an account, they make a unique Snapchat username.

45.     This is the name visible to other Snapchat users. An email address is required to register a Snapchat account and a new user must also provide a mobile phone number. This phone number is verified during the registration process. Snapchat sends an activation code which must be entered before proceeding with the registration step. However, a user may elect to bypass entering a phone number so

one may not always be present in the user's account. Snapchat also retains the account creation date.

46.     Snapchat stores device information such as the model, operating system, operating system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. They also collect unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access Snapchat. In the event the Snapchat user's application crashes, the company also collects a list of other installed applications on the device to detect any potential software conflicts.

47.     Snapchat has a "Group Stories" feature allowing multiple users to contribute photos and videos to the same "Story," a collection of posts that stay viewable for a limited amount of times. Snapchatters can name their group story and invite other users and "friends" by username to add content. The Group Stories will disappear if 24 hours pass without a user adding a new photo or video.

48.     In some cases, account users will communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users . Application providers typically retain records about such communications, including records of contacts between the user and the providers support services, as well as records of any actions taken by the provider or user as a result of the communications.  In addition, application providers often have records of the IP addresses used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help identify which computers or other devices were used to access the account.

49.     In my training and experience, evidence of who was using an application account may be found in address books, contact or buddy lists, email addresses in the account, and attachments to electronic messages, including pictures and files.

50.     Snapchat allows users to subscribe to their service by using email addresses and creating a profile name. The users can then post and share photographs and videos with other users whom they follow or follow them. Users can also send a private message to other users and also send photographs or videos directly to another user. The Snapchat application is primarily used on a smart device, such as

an Apple iPhone, Android cell phone, Apple iPad, or Android tablet. Access can be made available on a personal computer, although with limited functionality.

51. Based on my training, experience, and research, including the investigation to date, I know that individuals who view, download, and create child pornography frequently do so using their cellular phones and social media platforms, including Snapchat. This allows them to both view and store images/videos of child pornography on a device that is easily transportable and accessible. Additionally, the use of a smart phone allows individuals to utilize mobile apps such as Snapchat, where they can trade images/videos of child pornography with other users, and then save these images/videos onto their own device for future viewing or trading with other users.

52. In this specific instance, the subject represented to Victim 1 that he would send her pictures and videos to her family and friends, indicating that he may have taken a screen recording and saved them on his smart devices. He did not refute that implication when Victim 1 asked him to delete the recordings, only stating that he would "maybe" do so. Based on my training and experience, it is possible that he continues to have those videos and pictures saved locally on his smart devices.

## VIII.    CONCLUSION

53. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B-1 of this Affidavit, are located at the SUBJECT PREMISES, described in Attachment A-1. I respectfully request that this Court issue a search warrant for the SUBJECT PREMISES, authorizing the seizure and search of the items described in Attachment B-1.

54. Based on the forgoing, I also request that the Court issue the proposed search warrant on SNAP, INC. who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

55. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service or execution of this warrant.

22

# IX.   REQUEST FOR SEALING

56.     Due to the sensitivity of this investigation the disclosure of the search warrant, this affidavit and/or the application, and the attachments thereto, will jeopardize the progress of an ongoing investigation, it is requested that this warrant be filed under seal. Accordingly, I request that the Court issue an order that the search warrant, the affidavit in support of the application for the search warrant, and all attachments thereto be filed under seal until further order of this Court.

/s/Orcina A. Pacheco-Garcia (signed electronically)
ORCINA A. PACHECO-GARCIA
Special Agent
Federal Bureau of Investigation

Approved as to form by

_____
TANYA B. SYED
Assistant United States Attorney

Sworn and subscribed before me telephonically this __7 th day of October, 2020.

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

23

<u>**United States v. Jayson Fernandez Butay**</u>
**Penalties for Criminal Complaint**

<u>**Defendant**</u>
**Jayson Fernandez Butay**

<u>**COUNT 1:**</u>

VIOLATION:       18 U.S.C. § 2252(a)(4)(B) – Possession of Child Pornography

PENALTIES:       Maximum of up to 20 years in prison; or
                        Fine of up to $250,000; or both fine and imprisonment
                        Supervised release of at least 5 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)